IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TINA ARTEAGA, | CASE NO. CV-F-09-1860 LJO GSA |
| Plaintiff, | **ORDER ON DEFENDANTS' SUMMARY JUDGMENT MOTION** (Doc. 15) |
| vs. | |
| ASSET ACCEPTANCE, LLC., | |
| Defendant. / | |

## INTRODUCTION

Plaintiff Tina Arteaga ("Ms. Arteaga") asserts claims against defendant Asset Acceptance, LLC ("Asset") pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. §1692 *et seq.* ("FDCPA") and the California Rosenthal Act, Cal. Civ. Code §1788 *et seq.*, based on allegations that Asset called her "constantly and continuously" in an attempt to collect an allegedly unpaid debt, and threatened to "attach" her bank account. Asset moves for summary judgment of Ms. Arteaga's claims, pursuant to Fed. R. Civ. P. 56, arguing that no admissible, competent evidence demonstrates that Asset engaged in conduct to violate federal or state law, and the volume and pattern of calls did not violate FDCPA or the Rosenthal Act as a matter of law. Ms. Arteaga argues that questions of fact exist as to whether Asset's conduct violated the statutes. Having considered the parties' arguments and evidence, and the applicable case law, this Court GRANTS summary judgment in favor of Asset and DIRECTS the clerk of court to close this action.

## BACKGROUND

### Ms. Artega's Statement of Facts

Ms. Arteaga received a letter from Asset informing her that Asset was "now in possession" of one of her accounts, and was attempting to collect the debt. After receipt of that letter, Ms. Arteaga called Asset in "the early part of 2009" to dispute the debt, as she believes she had settled that debt around twelve years prior. Ms. Arteaga testified that the person she spoke with at Assert was "unprofessional." In addition, Ms. Arteaga testified that female she spoke with threatened her by telling her that Assert "could attach [her] bank accounts with or without" her "sending them the correspondence." According to Ms. Arteaga, Asset began calling her "in the early part of 2009, probably January or February." Ms. Arteaga testified that Asset called her "daily" or "real close to daily." Ms. Arteaga recalls that Asset's debt collection calls ended around the summer of 2009. On the basis of these facts, Ms. Arteaga asserts FDCPA and Rosenthal Act claims against Asset, arguing that Asset's constant and continuous calls and threats violate federal and state law.

### Asset's Statement of Facts

According to Asset's records, Asset employee Linda Plimely ("Ms. Plimely") received an incoming telephone call from Ms. Arteaga regarding the debt that Asset was seeking to collect on February 12, 2009. Ms. Arteaga advised Ms. Plimely that she had previously paid the debt, and that she had a copy of the check she used to settle it. Ms. Plimely declares that she did not threaten that Asset would initiate legal action against Ms. Arteaga or tell Ms. Arteaga that Asset would access her bank account.

Asset contends that before Ms. Arteaga called Asset, she expected Asset would threaten to attach her bank account. Asset points out that Ms. Arteaga researched the company on the internet "to see if it was even worth [her] time to call [Asset]" prior to the phone call. Ms. Arteaga testified that during her research, she "read very bad things" about Asset:

> They—there is—if you go on the Internet, you can—there's people that complain and warn you don't send your—don't send anything to Asset because they—you know, they've attached people's bank accounts. They've—I don't remember everything that's on there, but if you just do research on Asset and you'll come up with plenty of different complaints.

Ms. Arteaga found "warnings" that a person should not send information to Asset or Asset "will attach

your bank account, they will attach your wages." In her research on Asset, Ms. Arteaga read comments from people who wrote that "Asset had attached their wages. Asset had done horrible things, horrible things to affect them financially. So it was just giant [sic] warning out there as far as don't correspond with Asset at all." Although Ms. Arteaga does not believe everything she reads on the internet, she does believe "a good portion of what [she] read" about Asset.

Asset contends that Ms. Plimely did not threaten Ms. Arteaga, and any perceived threat was a misunderstanding. Asset disputes that Ms. Plimely discussed the possibility of attaching Ms. Arteaga's bank account. Asset argues, however, that even if Ms. Arteaga's statements are taken as true, Ms. Plimely did not threaten her.

Asset argues that the circumstances surrounded the call and the alleged threat demonstrate that Ms. Plimely's statement, if made, was not threatening or harassing. According to Ms. Arteaga's testimony, she called Asset to dispute the debt. The person asked if Ms. Arteaga had a "settled in full letter" to demonstrate that the debt was paid. Ms. Arteaga responded that she did not have the letter, because she had settled the debt. She further explained that she did not have a "settled in full" letter, but did have "copies of the check front and back" that she used to settle the account. The person then told her that "without a settled in full letter, [Ms. Arteaga] was still going to be responsible for the debt and to send [Asset] all the information [she] had." Ms. Arteaga responded:

> I told them that I had concerns about doing that because of their reputation in—and giving them my account number, and the person said that they could attach my bank account with or without that information. They could look up my information, things along those lines, and so they could do it with or without my sending the correspondence. I said okay and hung up.

Ms. Arteaga explained that she was concerned about sending Asset a copy of the settlement check because :

> by providing them my check they would then have my account number, and she said that she could---they could attach to my account with or without that. They could find that information. So I didn't want to make it easier for them to attach my account for a bill that I'd paid 12 years before that.

Ms. Arteaga further explained that she "had read very bad things, that they were very—they would attach—they would attach to people's bank account and things of that nature, and so I did not want to provide a check to them." According to Ms. Arteaga, she told the Asset

3

representative that she "had concerns about sending [Asset] a check" prior to when the Asset representative made the allegedly threatening statement.

Ms. Arteaga admitted that Asset's representative never threatened to sue her and never told her that Asset *would* attach her bank account. Rather, according to Ms. Arteaga, Asset's representative explained that Asset *could* gain access to her account without having the check.

According to Asset's records, after the February 12, 2009 call, Asset marked Ms. Arteaga's account as "disputed" and sent her a letter dated February 17, 2009 requesting that Ms. Arteaga send copies of any documents showing that she had previously paid the debt. Among other things, Asset's letter explained that Ms. Arteaga could send a letter stating that the account had been "paid in full or settled," or a copy of a cancelled check or other form of payment along "with a letter/statement that indicates a satisfaction amount relating to the payment instrument." Ms. Arteaga did not respond to Assert's February 17, 2009 letter.

Asset sent Ms. Arteaga a second letter dated March 18, 2009. The second letter again requested documents showing that Ms. Arteaga made the alleged payment. Asset received no response from Ms. Arteaga. On April 15, 2009, Asset updated it records to reflect that it considered Ms. Arteaga's dispute of the account to be "closed."

Asset then resumed efforts to collect the debt. Between April 16, 2009 and September 29, 2009, Asset's records reflect that Asset telephoned Ms. Arteaga a total of eighteen times. Specifically, Asset called on the following dates: 4/16, 4/28, 5/8, 5/13, 5/14, 5/27, 6/12, 6/16, 6/25, 6/30, 7/6, 7/13, 7/22, 8/4, 8/12, 8/18, 9/2, and 9/29. Asset noted the following outcome of the calls:

   (A)   On nine occasions, no one answered the phone;
   (B)   On three occasions, an answering machine was detected, but no message was left;
   (C)   On two occasions, an answering machine was detected and a message was left;
   (D)   On one occasion, a busy tone was detected;
   (E)   On one occasion, someone answered but did not confirm whether it was Ms. Arteaga;
   (F)   On one occasion, someone answered and selected a prompt to indicate that it was the right party, but the call dropped before it could be connected to a live representative; and
   (G)   On one occasion, the call dropped before it could be completed.

4

1  Asset contends that the purpose of the calls was to contact Ms. Arteaga to arrange payments to satisfy
2  the debt, and that no calls were placed with the intent to annoy, abuse or harass Ms. Arteaga.

3  Asset disputes Ms. Arteaga's recollection that Asset called "daily."  Ms. Arteaga claimed she
4  knew Asset called her because "[t]here were messages on the answering machine, and we have caller
5  ID."  But Ms. Arteaga did not know how many times Asset called her.  She also admitted that she was
6  getting calls "every few days" from a different collection agency in 2009.  Ms. Arteaga was unable to
7  say how many messages Asset left for her.  Ms. Arteaga admitted that she "would just delete through
8  them" and that she "didn't listen to the full message."  Ms. Arteaga could not remember how many times
9  her caller ID reflected that Asset had called her.  She explained that the caller ID displayed "just the 800
10 numbers," but conceded that she does not remember what the phone number was that she believed to
11 be connected to Asset.  She also admitted that more than one "800 number" displayed on her caller ID
12 in 2009.  Ms. Arteaga had no written records of the numbers displayed on her caller ID in 2009.

13 Asset submits that any alleged threat was a bona fide error.  Asset maintains policies and
14 procedures designed to avoid making false, deceptive, or misleading representations in connection with
15 the collection of a debt.  Asset's employees, including Ms. Plimely, participate in a comprehensive
16 training program, and learng about federal and state collection laws.  Asset's collectors are trained that
17 it is unlawful to threaten to sue a consumer when Asset does not intend to do so, and unlawful to
18 threaten to attach a consumer's asssets when Asset does not have a judgment against the consumer.
19 Asset's employees are tested annually on their knowledge of FDCPA and other applicable laws, and are
20 advised that deviation from the requirements of FDCPA or state collection laws can be grounds for
21 disciplinary action, including termination.

**Procedural History**

23 Ms. Arteaga initiated this action on October 21, 2009.  Asset moved for summary adjudication
24 on July 9, 2010. Ms. Arteaga opposed the pending motion on August 10, 2010. Asset replied on August
25 16, 2010.  This Court found this motion suitable for decision without a hearing, vacated the August 24,
26 2010 hearing pursuant to Local Rule 230(g), and issues the following order.
27 ///
28 ///

**STANDARD OF REVIEW**

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing of sufficient evidence to establish an essential element of the nonmoving party's claim, and on which the non-moving party bears the burden of proof at trial. *Id*. at 322. "The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the material on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production shifts and the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987)(quoting Fed. R. Civ. P. 56(e)).

To establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor, but "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First National Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968); *T.W. Elec. Serv.*, 809 F.2d at 631. The nonmoving party must "go beyond the pleadings and by her own affidavits, or by depositions, answer to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Fed. R. Civ. P. 56(e) requires a party opposing summary judgment to "set out specific facts showing that there is a genuine issue for trial." "In the absence of specific facts, as opposed to allegations, showing the existence of a genuine issue for trial, a properly supported summary judgment motion will be granted." *Nilsson, Robbins, et al. v. Louisiana Hydrolec*, 854 F.2d 1538, 1545 (9th Cir. 1988).

With these standards in mind, the Court turns to defendants' arguments.

## DISCUSSION

### 15 U.S.C. §1692d and 15 U.S.C. §1692d(5)

15 U.S.C. §1692d of the FDCPA ("Section 1692d") prohibits debt collectors from engaging in "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of any debt." 15 U.S.C. §1692d. Section 1692d includes a non-exhaustive list of conduct that constitutes harassment, oppression or abuse, including "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number." 15 U.S.C. §1692d(5). Ms. Arteaga contends that by calling her "daily" or "close to daily," Asset violated Section 1692d and Section 1692d(5).

"[C]laims under § 1692d should be viewed from the perspective of a consumer whose circumstances makes him relatively more susceptible to harassment, oppression, or abuse." *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir.1985); *Clomon v. Jackson,* 988 F.2d 1314, 1318-19 (2d Cir.1993). This standard is similar to that of the "least sophisticated debtor," which the Ninth Circuit applies to other sections of the FDCPA. *See, Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162, 1171 (9th Cir.2006). This objective standard "ensure[s] that the FDCPA protects all consumers, the gullible as well as the shrewd ... the ignorant, the unthinking and the credulous." *Clomon*, 988 F.2d at 1318-19.

Asset argues that Ms. Arteaga's claims fails as a matter of law, because she has failed to raise a question of fact as to whether Asset's alleged conduct rises to the level of "harassment" under Section 1692d or Section 1692d(5). Ms. Arteaga argues that a question of fact exists as to whether Asset harassed, annoyed, or abused her based on the "daily" or "nearly daily" calls, and the Asset representative's statement that Asset "could" attach her account whether or not Ms. Arteaga sent Asset a copy of her check.

"Whether there is actionable harassment or annoyance turns not only on the volume of calls made, but also on the pattern of calls." *Joseph v. J.J. Mac Intyre Cos., LLC,*, 238 F. Supp.2d 1158, 1168 (N.D. Cal. 2002). Court opinions differ, however, as to the amount or pattern of calls sufficient to raise a triable issue of fact regarding the intent to annoy, harass, or oppress. *See Knaft v. Nationwide Credit*

7

1  *Inc.*, 2010 WL 2025323, *3-4 (C.D. Cal. 2010).  Although there is no bright-line rule, certain conduct
2  generally is found to either constitute harassment, or raise an issue of fact as to whether the conduct
3  constitutes harassment, while other conduct fails to establish harassment as a matter of law.  As
4  explained more fully below, this Court finds that even if Ms. Arteaga's testimony is believed to be true,
5  she has failed to raise a genuine issue of material fact on her Section 1692d or Section 1692d(5) claims.

6        A debt collector may harass a debtor by immediately recalling a debtor after a debtor has hung
7  up the telephone.  In *Bingham v. Collection Bureau, Inc.*, 505 F.Supp. 864 (Dist.N.D.1981), for example,
8  the court found that a collector's immediate recalling of the debtor after the debtor hung up on the
9  collector constituted harassment.  Likewise, in *Kuhn v. Account Control Technology, Inc.* 865 F.Supp.
10 1443, 1153 (Dist. Nev.1994), the court found that the debt collector harassed the debtor in violation of
11 Section 1692d(5) when, after the debtor hung up on debt collector's representative, the debt collector
12 recalled the debtor's place of employment two additional times within a five minute period of time.  *See*
13 *also, Fausto v. Credigy Services Corp.*, 598 F.Supp.2d 1049 (N.D.Cal.2009) (evidence that debt
14 collection agency's employees had made more than 90 calls to consumers' home, that content of calls
15 had been harassing in nature, employees had failed to identify themselves when calling, had allowed
16 phone to ring repeatedly, and called back immediately after consumers hung up phone raised fact issue
17 as to whether employees' conduct was offensive, precluding summary judgment).

18       Similarly, a debt collector may harass a debtor by continuing to call the debtor after the debtor
19 has requested that the debt collector cease and desist communication.[1]  In *Fox v. Citicorp Credit*
20 *Services, Inc.*, 15 F.3d 1507 (9th Cir. 1994), the Ninth Circuit found that a debtor stated a claim under
21 Section 1692d where the debtor testified that the debt collector's agent was intimidating and threatening
22 in her phone conversations with the debtor, the debtor described threats of garnishment accompanied
23 by demands for overnight sending of payments, and the agent called the debtor at work after the debtor
24 had twice requested that she not be phoned at her place of employment.  *See also, Chiverton v. Federal*
25 *Financial Group, Inc.*, 399 F.Supp.2d 96 (D.Conn.2005) (debt collector's agent violated FDCPA's
26 "harassment or abuse" provision during telephone call to consumer, who was in her 70's, by making

---

28    [1] In a separate provision, the FDCPA requires a debt collector to discontinue communication after a request to cease and desist communications has been made by the debtor. 15 U.S.C. §1692c(c).

comments regarding consumer's age, mental acuity and activity, and by repeatedly calling consumer after consumer had told agent not to contact her again); *Joseph*, 238 F.Supp.2d 1158 (material issues of fact existed as to whether debt collection agency engaged in actionable harassment or annoyance when, over 19-month period, it made nearly 200 calls to debtor, who was physically disabled senior citizen, and, on some days, made multiple calls after debtor requested that no further calls be made, precluding summary judgment for agency on debtor's claims that agency's repeated calls violated FDCPA and Rosenthal Act).

The practice of calling a debtor outside of his or her home—by calling the debtor's workplace or the homes of a debtor's family and friends—or calling at inconvenient hours, can also constitute harassment. *See, Gilroy v. Ameriquest Mortg. Co.*, 632 F.Supp.2d 132 (Dist. N.H.2009) (intent to harass may be inferred by evidence that a debt collector continued to call the debtor after the debtor had asked not to be called and had repeatedly refused to pay the alleged debt, or during a time of day which the debtor had informed the debt collector was inconvenient.); *Sanchez v. Client Services, Inc.*, 520 F.Supp.2d 1149 (N.D. Cal. 2007) (actions of debt collectors seeking to collect consumer's debt, including making 54 telephone calls to consumer at work and leaving 24 messages on work answering machine, allegedly in an attempt to obtain consumer's location information, were intended to annoy, abuse and harass consumer, in violation of FDCP and Rosenthal Act); *Kerwin v. Remittance Assistance Corp.*, 559 F.Supp.2d 1117, 1124 (Dist. Nev. 2008) ("Intent to annoy, abuse, or harass may be inferred from the frequency of calls, the substance of the calls, or the place to which phone calls are made.").

Calling a debtor numerous times in the same day, or multiple times in a short period of time, can constitute harassment under the FDCPA. *See, e.g., Akalwadi v. Risk Management Alternatives, Inc.*, 336 F.Supp.2d 492 (Dist. Md. 2004) (genuine issue of material fact regarding whether debt collector, in telephoning consumer on daily basis and in one occasion making three phone calls in space of just five hours, and had resorted to abusive and harassing phone calls in attempt to collect debt, precluded entry of summary judgment on consumer's resulting claims under the FDCPA); *Kuhn v. Account Control Tech., Inc.*, 865 F. Supp. 1443, 1453 (Dist. Nev. 1994) (six telephone calls in 24 minutes constituted harassment in violation of section 1692d(5)); *United States v. Central Adjustment Bureau, Inc.*, 667 F. Supp. 370, 376 (N.D. Tex. 1986), *aff'd*, 823 F.2d 880 (5th Cir. 1987) (finding harassment where debt

collector made as many as four or five telephone calls to the same debtor in one day); *Akalwadi v. Risk Mgmt. Alternatives, Inc.*, 336 F.Supp.2d 492, 506 (Dist. Md. 2004) (telephone calls made on a daily basis and three phone calls made within five hours raises question of fact for jury).

By contrast, some conduct does not constitute harassment as a matter of law. *See e.g., Gallagher v. Gurstel, Staloch & Chargo, P.A.,* 645 F.Supp.2d 795 (Dist. Minn. 2009) (single laugh by employee of debt collector during phone call with debtor to discuss holds placed on funds in debtor's bank account was not harassing, oppressive, or abusive conduct violative of FDCPA; laugh was during a single phone call involving only employee and debtor that was initiated by debtor, and there were no profanities, name calling, insults, unwanted calls or disclosure of private information to third parties caused by debt collector); *Baker v. Allstate Financial Services, Inc.*, 554 F.Supp.2d 945 (Dist. Minn. 2008) (debt collector's statement in voicemail that consumer's "case" was "urgent" and "time sensitive" was not sufficiently harassing, oppressive, and abusive to violate FDCPA); *Thomas v. LDG Financial Services, Inc.,* 463 F.Supp.2d 1370 (N.D. Ga. 2006) (alleged conduct by debt collector during telephone conversation, in telling debtor that they were going to get their money one way or another, yelling that Georgia was a garnishable state, then hanging up, and asking debtor what her problem was because she was making the same salary as she did when she was paying her bills, did not rise to the level of harassment prohibited by the FDCPA); *Tucker v. The CBE Group, Inc.*, – F.Supp. 2d. –, 2010 WL 1849034 (M.D. Fla. 2010) (facts did not raise reasonable inference of intent to harass where debt collector made 57 calls to the plaintiff, including seven calls in one day, because the debt collector never spoke to the debtor, was never asked to cease calling, and never called back on the same day it had left a message).

Under the facts of this case, the Court finds that Asset's conduct did not rise to the level of harassment under Section 1692d, and fails to raise a triable issue of fact as to whether the phone calls were initiated with the intent to harass in violation of Section 1692(5). None of the egregious conduct identified above is present in this case. Ms. Arteaga presents no evidence that Asset called her immediately after she hung up, called multiple times in a single day, called her place of employment, family, or friends, called at odd hours, or called after she requested Asset to cease calling. Indeed, Ms. Arteaga does not claim that she requested Asset to cease calling her, and only recalls the substance of

one conversation in which Ms. Arteaga initiated the communication with Asset. Ms. Arteaga fails to cite a single case in which "daily" or "nearly daily" phone calls alone raise an issue of fact as to these claims. Rather, the case law supports Asset's position that, even if Ms. Arteaga's allegations are believed as true, and considered under the "least sophisticated debtor" standard, the conduct does not constitute harassment as a matter of law. *See, e.g., Udell v. Kansas Counselors, Inc.,* 313 F.Supp.2d 1135 (Dist. Kan.2004) (fact that debt collector placed four automated telephone calls to consumers over course of seven days without leaving message did not, as matter of law, constitute harassment under DCPA). Accordingly, this Court grants summary judgment in favor of Asset on Ms. Arteaga's Section 1962d and 1962d(5) claims.

### Rosenthal Act

The above analysis applies equally to Ms. Arteaga's Rosenthal Act claims. Under the Rosenthal Act, it is unlawful to cause "a telephone to ring repeatedly or continuously to annoy the person called." Cal. Civ. Code 1788.11(d), or "[c]ommunicating, by telephone or in person, with the debtor with such frequency as to be unreasonable and constitute an harassment to the debtor under the circumstances." *Id*. at 1788.11(e). For the reasons explained above, this Court finds that "daily" calls alleged by Ms. Arteaga fails to raise a genuine issue of material fact as to whether Asset's communications were so frequent as to be unreasonable or to constitute harassment under the circumstances regarding Ms. Arteaga's Rosenthal Act claims. *See Joseph*, 238 F. Supp. 2d 1158 (finding that actionable harassment or annoyance under Rosenthal Act may be based on either the volume or pattern of calls, similar to FDCPA analysis).

### 15 U.S.C. §1692e(4) and 15 U.S.C. §1692e(5)

The FDCPA further provides that a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of a debt." 15 U.S.C. §1692e. Like Section 1692d, Section 1692e proscribes specific conduct in enumerated sections. Ms. Arteaga contends that by "threatening to attach her bank account," Asset violated two Section 1692e subsections.[2] Ms. Arteaga argues that Asset's statement violated Section 1692e(4), which prohibits a "representation or

---

[2] Ms. Arteaga abandoned her Section 1692e(10) claim in opposition to this motion.

11


implication that nonpayment of any debt will result in the...attachment...of any property...unless such action is lawful and the debt collector or creditor intends to take such action." Ms. Arteaga further contends that Asset's statement that it could attach her bank account was a "threat to take any action that cannot legally be taken or that is not intended to be taken," conduct forbidden by Section 1692e(5).

Asset argues that Ms. Arteaga's Section 1692e claims fails as a matter of law for three reasons. First, Asset disputes that its representative made the statement, and contends that no admissible evidence, beyond Ms. Arteaga's unsupported and conclusory testimony, supports her assertions. Second, Asset argues that even if Ms. Plimely made the statement to Ms. Arteaga, the statement was not a threat. Asset points out that Ms. Arteaga admitted that she was told that Asset *could* attach her bank accounts, but was never told that Asset *would* attach her bank accounts. Third, Asset contends that the disputed statement was not improper, because Section 1692e does not prohibit a debt collector from explaining its legal options to a debtor.

The Court considers Section 1692e claims under the "least sophisticated consumer standard." *Swanson v. Southern Oregon Credit Service, Inc.,* 869 F.2d 1222 (9th Cir. 1988). The "least sophisticated consumer" standard serves dual purposes. First, it protects consumers, even those who are naive and trusting, against deceptive debt collection practices. Second, it "protects debt collectors against liability for bizarre or idiosyncratic interpretations of collection notices." *Clomon*, 988 F.2d 1314. The standard is objective, and the plaintiff's actual perception is immaterial to the Court's analysis of whether the statement was misleading to the least sophisticated consumer. *Gonzalez v. Arrow Financial Servs., LLC.*, 489 F. Supp. 2d 1140 (S.D. Cal. 2007).

"[M]erely advising the debtor of the agency's options with which to pursue the debt is the sort of truism that is legally insufficient to violate 1692e." *Sparks v. Phillips & Cohen Assoc., Ltd.*, 641 F. Supp. 2d 1234, 1249 (S.D. Ala. 2008). In *Sparks*, the plaintiff alleged that the debt collector stated that it could force her to sell her deceased mother's house in probate to pay her mother's debts. The court found that such a statement was neither a threat or a false statement, but rather an "innocuous statement" of the debt collector's "legal rights." *Id*. Accordingly, the court granted summary judgment in favor of the debt collector on the plaintiffs' Section 1692e(4) and (5) claims. Similarly, in *Shuler v. Ingram & Assoc.*, – F.Supp. 2d –, 2010 WL 183868 (N.D. Ala. 2010), the court found that a debt collectors

statement that it "may place a lien on plaintiffs' property, garnish [plaintiff's] wages, that [the debt collector] prosecutes debts like his, and always wins" did not constitute threats or actions that the debt collector could not or did not intent to take. By these standards, Asset's alleged statement that it could attach Ms. Arteaga's bank account even if Ms. Arteaga did not send Asset her check would be viewed as "informational" by the least sophisticated consumer, and not a threat to do something that Asset could not legally do.

In addition, the circumstances surrounding the statement make clear that the least sophisticated consumer would not believe the statement to be a threat to take action without authority or intent to do so. Ms. Arteaga admits that she called Asset to dispute the account. Ms. Arteaga further admits that before she called Asset to dispute the account, she had done online research regarding on Asset and had read warnings that she should not send any information, including checks, to Asset. Ms. Arteaga further admits that she did not want to send Asset the check to make it easier on Asset to attach her account. Ms. Arteaga further admits that she asked Ms. Plimely about whether sending the check would allow asset to attach her bank account, and that Ms. Plimely's statement was in response to Ms. Arteaga's direct question related to whether Asset could attach her bank account. Ms. Arteaga admits that she was never told that Asset *would* attach her bank account. Under these circumstances, in which the consumer had initiated the phone call, raised the subject regarding the attachment of the bank account, and asked a question about Asset's abilities to attach her bank account, the allegedly threatening statement was a response to the customer's direct question on the subject, and the debt collector did not make any statements that action would be taken, the least reasonable consumer would understand Ms. Plimely's response was informational and not a threat. *See, Wade v. Regional Credit Ass'n*, 87 F.3d 1098 (9th Cir. 1996) (collection agency's notice that failure to pay amount may adversely affect debtor's credit was not a threat to take action that could not legally be taken in violation of FDCPA). Accordingly, this Court grants summary judgment in favor of Asset on these claims.

///
///
///
///

**Bona Fide Error**

In the alternative, even if Ms. Arteaga successfully raises a question of fact, the bona fide error affirmative defense bars liability on her Sections 1692e(4) and (5) claims, and Rosenthal Act claims. Section 1692k(c) provides:

> A debt collector may not be held liable in any action brought under this title [15 USCS §§ 1692 et seq.] if the debt collector shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

15 U.S.C. §1692k(c). Debt collectors may assert the "bona fide error" defense as an affirmative defense to avoid liability. "The debt collector must only show that the violation was unintentional, not that the communication itself was unintentional." *Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998). Because it is an affirmative defense, Asset bears the burden of proof at summary judgment stage. *Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162, 1177 (9th Cir. 2006). To establish its affirmative defense, Asset must demonstrate that it maintains policies and procedures designed to avoid making false deceptive or misleading representations in connection wit the collection of a debt.

Asset submits the declarations of Ms. Plimely and Ken Proctor, the litigation coordinator and former Vice President of Compliance for Asset, to support its bona error defense. According to Mr. Proctor, Asset maintains policies and procedures designed to avoid making any false, deceptive or misleading representation in connection with collection of a debt. Asset's employees, including Ms. Plimely, participate in a comprehensive training program for new collectors and continuing education/training for experienced collectors regarding those policies and procedures. The training incorporates several learning approaches, including computer-based training, on the-job training and mentoring, and interactive classroom activities. The training sessions focus on training in technology and technology tools, federal and state collection laws (with particular emphasis on the FDCPA), and telephone collection techniques as well as core company policies, procedures and practices. Among other things, collectors are specifically trained that it is unlawful to threaten to sue a consumer when Asset does not intend to do so and that it is unlawful to threaten to attach a consumer's assets when Asset does not have a judgment against the consumer. In addition, account representatives are tested annually on their knowledge of the FDCPA and other applicable laws. Account representatives not

achieving the minimum standards are required to complete an FDCPA review session and are then retested. The company provides annual supplemental instructions on the FDCPA and collection techniques to account representatives. Asset also provides on-going training in the form of training bulletins to account representatives on a wide variety of issues. Asset's employees are advised that any deviation from the requirements of the FDCPA or state collection laws can be grounds for disciplinary action, up to and including termination. Ms. Plimely declares that Asset trained her that it was against the law to threaten a consumer with a lawsuit if Asset did not have the intent or ability to bring legal action against the consumer, and to threaten to garnish wages or attach assets if Asset did not have a judgment against the consumer. Based on this evidence, Asset establishes a prima facie case that Ms. Plimely's statement (if any) was a bona fide error.

Ms. Arteaga fails to dispute Asset's evidence of its policies and procedures. In opposition, Ms. Arteaga submits that she "lacks sufficient knowledge" of Asset's policies and procedures. In addition, Ms. Arteaga claims that Asset failed to submit any evidence to support its position that it maintains adequate policies and procedures, notwithstanding the fact that Asset submitted the two declarations described above. Ms. Arteaga provides no evidence or argument to oppose meaningfully Asset's bona fide error affirmative defense.

The uncontested evidence establishes that Asset had policies and procedures in place that were reasonably adapted to avoid false representations made to consumers, or implications that Asset would attach a consumer's bank account if a debt was not paid without the legal right to do so. Ms. Plimely declares that Asset trained her that it was against the law to threaten to garnish wages or attach assets if Asset did not have a judgment against the consumer. Thus, if the factfinder were to believe Ms. Arteaga that Ms. Plimely stated that Asset could attach her bank account, Ms. Plimely would have been acting contrary to policies, procedures and training that Asset implemented to prevent debtor harassment. According to the evidence, Ms. Plimely was given detailed training and was tested on the requirements of the FDCPA. The training included a blanket prohibition on making false or misleading statements, or using any threatening, harassing or abusive language. These procedures were reasonable methods for preventing collection personnel from making inappropriate statements during collection calls. Accordingly, Asset has established that a violation of Section 16972e(4) or (5), or the Rosenthal Act,

1  was the result of a bona fide error, and is entitled to summary judgment in its favor.

## CONCLUSION

For the foregoing reasons, this Court GRANTS summary judgment in favor of defendant Asset and against plaintiff Ms. Arteaga. The clerk of court is DIRECTED to enter judgment in favor of Asset and against Ms. Arteaga and to close this action.

IT IS SO ORDERED.

**Dated:    August 23, 2010**                            **/s/ Lawrence J. O'Neill**
                                                        UNITED STATES DISTRICT JUDGE